## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KYLE A. ASHE,                                    *

           *Pro Se Plaintiff,*          *

    v.                                           *

LINDA MCMAHON, in her official                   *
capacity as Secretary of Education:              *

U.S. DEPARTMENT OF                               *
EDUCATION:                                       *

DONALD J. TRUMP, in his official                 *
capacity as President of the United States;      *

and the UNITED STATES OF                         *
AMERICA,                                         *

           *Defendants.*               *

Civil Action No. MJM 25 CV 2619

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### COMPLAINT

1.    This case is about holding the United States Government accountable for its predatory lending practice of duplicitously moving the goalposts on existing student loan borrowers and ensnaring them in a never-ending political tug-of-war. It concerns the calculated and vindictive efforts by the Trump Administration and the MAGA Republican-led majority in Congress to scapegoat innocent student loan borrowers who reasonably relied on their government's longstanding promises of affordable and reasonable repayment options.[1]

2.    As part of the 2025 budget reconciliation process, the 119th Congress shoehorned

---

[1] MAGA (or "Make America Great Again") refers to a nativist political movement within the Republican Party that emerged in the United States during the 2016 presidential campaign of its putative leader, Donald Trump. MAGA is "known for its particularly combative character, which exemplifies the extreme partisanship of contemporary American politics." *See MAGA Movement,* Adam Volle, BRITANNICA, https://www.britannica.com/topic/MAGA-movement (last updated July 15, 2025).

provisions through the "One Big Beautiful Bill Act" ("OBBBA" or "the Act") that arbitrarily repeal all existing income-driven repayment plans for current student loan borrowers, impose higher monthly payments, and subject millions of borrowers to needless interest accrual during a forced forbearance period that was directly caused by MAGA Republican-led legal challenges to the former administration's Saving On A Valuable Education Plan ("SAVE").

3.    Accordingly, Kyle Ashe, appearing *pro se*, challenges the constitutionality and legality of those provisions and brings this action under the Administrative Procedure Act (APA), the United States Constitution, and the doctrines of detrimental reliance and breach of contract. He seeks declaratory, injunctive, and equitable relief, including a writ of mandamus that compels the Department of Education to restore the income-driven repayment plans for existing student loan borrowers and halt interest accrual during litigation-related involuntary forbearance.

## JURISDICTION AND VENUE

4.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343; the Mandamus Act, 28 U.S.C. § 1361; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706; the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202; and the All Writs Act, 28 U.S.C. § 1651. Furthermore, jurisdiction is proper under 28 U.S.C. § 1346, given that this is a civil action against the federal government founded upon the U.S. Constitution and acts of Congress.

5.    Venue is appropriate in this district under 28 U.S.C. § 1391(e) because Mr. Ashe resides in Baltimore, Maryland, and a substantial portion of the events giving rise to the claims occurred here.

## PARTIES

6.      Mr. Ashe is a first-generation, licensed attorney and a committed public servant who works and resides in Baltimore, Maryland.

7.      Defendant, Linda McMahon, is the Secretary of Education and the highest ranking official at the United States Department of Education ("ED"). Secretary McMahon is responsible for the supervision and management of all the agency's decisions and actions. Mr. Ashe sues Secretary McMahon in her official capacity.

8.      Defendant, the Department of Education, is the federal agency responsible for administering federal student loan programs and repayment programs and policies. ED's principal place of business is located at 400 Maryland Avenue SW, Washington, D.C 20202.

9.      Defendant, Donald J. Trump, is the 47th President of the United States and signed the OBBBA into law. He and Secretary McMahon are responsible for the unconstitutional and illegal acts that underlie this action. Mr. Ashe sues President Trump in his official capacity.

10.     Defendant, the United States of America, is the sovereign entity responsible for the exercise of illegal actions taken by the named Defendants in this case. The United States of America is included as a Defendant under 5 U.S.C. § 702 to ensure that Mr. Ashe obtains adequate relief in the event this Court issues an injunction.

## FACTUAL ALLEGATIONS

## I.      *Income-Driven Student Loan Repayment Plans and Public Service Loan Forgiveness.*

11.     In 1993 and 1994—when Mr. Ashe was only four years old—Congress enacted the Student Loan Reform Act and amended the Higher Education Act of 1965 to become the primary lender and creditor of student loans and expand access to postsecondary education by

3

reducing the financial barriers associated with tuition and attendance.[2] The legislation enabled borrowers to choose between four repayment plans: a standard repayment plan, a graduated repayment plan, an extended repayment plan, and an income-contingent repayment plan, which is more commonly referred to as income-drive repayment ("IDR").[3] The statute directs the Secretary of Education to provide student loan borrowers "with varying annual repayment amounts based on the income of the borrower."[4] For better or worse, and aside from expanding IDR with more lenient repayment terms and adding the Income-Based Repayment plan ("IBR") in 2007, these repayment plans remained largely unchanged for over thirty years.[5]

12.     By 2010, and in response to growing national concern over the affordability of higher education and the long-term consequences of unmanageable student loan debt, Congress enacted the Health Care and Education Reconciliation Act, capping monthly payments associated with IDR plans at 10% of a student loan borrower's monthly discretionary income.[6] This led to the establishment of the "Pay as You Earn" ("PAYE") and "Revised Pay as You Earn" ("REPAYE") plans in 2012 and 2015, respectively.[7] Both plans provide student loan borrowers with monthly payments based the same formula, which equates to 10% of the student loan borrower's discretionary income, divided over twelve months.[8]     Both plans also define

[2] *See* 20 U.S.C. §§ 1087a-1087h; *Biden v. Nebraska*, 143 S. Ct. 2355, 2362 (2023).

[3] 20 U.S.C. § 1087e(d)(1).

[4] *Id.*

[5] College Cost Reduction and Access Act, Pub. L. No. 110-84, 121 Stat. 784 (2007).

[6] *President Obama Signs Historic Health Care and Education Legislation*, Office of the White House Press Secretary, THE WHITE HOUSE, Mar. 30, 2010, https://obamawhitehouse.archives.gov/the-press-office/president-obama-signs-historic-health-care-and-education-legislation#:~:text=This%20legislation%20strengthens%20the%20Pell,10%25%20of%20their%20discretion ary%20income.

[7] Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 77 FR 66088-01; Student Assistance General Provisions, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program, 80 FR 67204-01.

[8] *Income Driven Repayment Plans*, FEDERAL STUDENT AID, https://studentaid.gov/manage-loans/repayment/pl ans/income-driven (last visited Jul 26, 2025); *see also Revised Pay As You Earn (REPAYE): How It Works*, Carole Pope, LENDING TREE, July 24, 2023, https://www.lendingtree.com/student/repaye-revised-pay-as-you-earn-program/#:~:text=apply%20for%20REPAYE-,What%20is%20Revised%20Pay%20As%20You%20Earn%20 (REPAYE)?,tool%20to%20get%20an%20idea.

discretionary income as the difference between a borrower's adjusted gross income and 150% of the federal poverty line based on the borrower's state of residence and family size.[9]

13.    Additionally, in 2007, with sweeping bipartisan support to address ongoing difficulties with attracting and retaining skilled public sector workers, President George W. Bush signed Public Service Loan Forgiveness ("PSLF") into law as part of the College Cost Reduction Act. PSLF "provides employers an invaluable resource by lowering the primary barrier keeping new graduates from pursuing public service careers – student loan debt."[10]

14.    Specifically, PSLF offers loan cancellation to public service workers who work for ten years in eligible public sector jobs so long as they enroll in a qualifying repayment plan and make the required 120 payments..[11]  Of particular import, PAYE and REPAYE are and were among the repayment plans that qualify for PSLF relief.[12]

15.    Consequently, not only were PAYE and REPAYE essential bridges for middle- and low-income student loan borrowers to access higher education, but, when used in conjunction with PSLF, PAYE and REPAYE also represented a financial lifeline to millions public servants like Mr. Ashe who could not otherwise afford their monthly payments under any of the standard student loan repayment plans.[13]

16.    For more than a decade, ED routinely and expressly represented to millions of other prospective and current student loan borrowers—including Mr. Ashe—that PAYE and REPAYE

---

[9] *Discretionary Income*, Glossary, FEDERAL STUDENT AID, https://studentaid.gov/help-center/answers/article/discret ionary-income (last visited July 26, 2025).

[10] *Public Service Loan Forgiveness*, AMERICAN BAR ASSOCIATION, https://www.americanbar.org/advocacy/governm ental_legislative_work/priorities_policy/legaleducation/pslfhomepage/#:~:text=The%20federal%20Public%20Servc e%20Loa n,low%2Dpaying%20public%20service%20jobs (last visited Jul. 26, 2025).

[11] 20 U.S.C.A. § 1087e(m)(1)

[12] *What repayment plans qualify for Public Service Loan Forgiveness (PSLF)?*, FEDERAL STUDENT AID, https://student aid.gov/help-center/answers/article/ qualifying-repayment-plan-for-pslf (last visited July 26, 2025).

[13] *See Student Loan Forgiveness Statistics*, Melanie Hanson, EDUCATION DATA INITIATIVE, Aug. 28, 2024, https://educationdata.org/student-loan-forgiveness-statistics ("In 2023, an average of 1.04 million PSLF applications were pending at any given time.").

(among other IDR plans) were reliable, long-term repayment options. In fact, PAYE, REPAYE, and other IDR options were explicitly advertised to Mr. Ashe and millions of other prospective and current student loan borrowers *via* Federal Student Aid's Website, and as part of ED's mandatory Student Loan Entrance Counseling.[14] Information that ED disseminated about PAYE and REPAYE was also discussed in detail in government publications, news articles, and during pre-enrollment seminars at schools and universities.

17.     Furthermore, when borrowers take out student loans, they sign a legally enforceable master promissory note ("MPN") with ED for each loan. PAYE and REPAYE (among other IDR plans) were expressly incorporated, detailed, and cemented within the contractual terms and conditions of the MPNs for millions of student loan borrowers, including Mr. Ashe. Millions of these MPNs—including Mr. Ashe's—unambiguously establish the borrower's right to select among the various IDR plans (including PAYE or REPAYE), and they dedicate entire, multi-page sections to outlining the payment formulas and calculations for each listed repayment plan.

18.     None of the terms within the MPNs contemplate that the existing repayment plans detailed within the terms and conditions of those notes, such as PAYE and REPAYE, would later be rescinded or repealed to the detriment of contracting student loan borrowers. The Higher Education Act and the Student Loan Reform Act were created to provide *better* access and financial assistance to students pursuing post-secondary education, and the MPN was not implemented until years after the enactment of such legislation.[15]

---

[14] *Income-Driven Repayment Plans*, FEDERAL STUDENT AID, https://studentaid.gov/manage-loans/repaym ent/plans/income-driven (archives 2010-present). *Complete Your Federal Student Aid Counseling Requirement*, FEDERAL STUDENT AID, https://studentaid.gov/counseling-selection (last visited July 27, 2025).
[15] GEN-99-08, *Introduction of the Master Promissory Note in the Direct Loan Program for Academic Year 1999-2000*, Greg Woods, FEDERAL STUDENT AID. Feb. 22, 1999, https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/1999-02-19/gen-99-08-introduction-master-promissory-note-direct-loan-program-academic-year-1999-2000#:~:text=Beginning%20with%20the%201999%2D2000,the%20front%20of%20the%20form.

## *II.    COVID-19 and the Focus on Student Loan Relief.*

19.    On March 20, 2020, in response to the COVID-19 pandemic and growing concerns over the bubbling student loan debt crisis, Congress and President Trump issued a moratorium that suspended payments and interest on all student loans.[16] The moratorium underwent numerous extensions and continued until September 1, 2023.[17] During that period, Mr. Trump lost the 2020 Presidential Election to Joseph Biden, who became the 46th President of the United States.[18]

20.    On July 10, 2023, after years of urging from policymakers and advocates across the political spectrum to fix well-documented flaws with the student loan system, the Secretary of Education under President Biden, issued new regulations that converted REPAYE into the more affordable SAVE plan and involuntarily transitioned Mr. Ashe and millions of other borrowers previously enrolled in REPAYE into the SAVE plan.[19] Fortunately, for Mr. Ashe and most of those borrowers, their monthly payments either remained the same or were reduced as a result of the new plan. But the creation of the SAVE plan marked the beginning of a broader, politically-charged regulatory overhaul that would result in consequences well beyond what Mr. Ashe and those borrowers originally agreed to upon enrolling in REPAYE or PSLF.

21.    Although it was intended to help student loan borrowers, President Biden's SAVE plan was met with fierce partisan resistance and legal challenges led by far-right MAGA Republican leaders, particularly due to SAVE's more lenient forgiveness provisions.[20] As further

---

[16] *Student Loans: A Timeline of Actions Taken in Light of the COVID-19 Pandemic*, Alexandra Hegji, CONGRESS.GOV, Aug. 27, 2024, https://www.congress.gov/crs-product/IF12136?utm.

[17] *Id.*

[18] *Biden Wins Presidency, Ending Four Tumultuous Years Under Trump*, Jonathan Martin and Alexander Burns, THE NEW YORK TIMES, Apr. 26, 2021, https://www.nytimes.com/2020/11/07/us/politics/biden-election.html.

[19] *Income-Drive Repayment 101*, THE INSTITUTE FOR COLLEGE ACCESS AND SUCCESS, Dec. 2024, https://ticas.org/wp-content/uploads/2024/12/IDR-101-12.6.24.pdf; *see also* Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, 88 FR 43820-01.

[20] *See, e.g., Biden v. Nebraska*, 600 U.S. 477, 506 (2023) (holding that the Secretary of Education's broad loan forgiveness program exceeded his statutory authority).

7

detailed below, the Trump Administration and MAGA Republican leaders subsequently embarked on a years-long smear campaign that maliciously painted all student loan borrowers as privileged and entitled Ivy League elites who sought force working-class Americans to foot the cost of their education, and that laid siege to the integrity and reputation of millions of dedicated and hard-working civil servants. Mr. Ashe, like many others, falls into both categories.

22.    On June 24, 2024, the U.S. District Court for the Eastern District of Missouri preliminarily enjoined the loan forgiveness provisions set forth under SAVE.[21]  By August of 2025, the Eighth Circuit Court of Appeals affirmed and expanded the injunction by placing all student loan borrowers enrolled in SAVE—including Mr. Ashe—on administrative forbearance.[22]  This prevented Mr. Ashe and millions of other borrowers from making progress toward PSLF relief for over a year. Even if Mr. Ashe or any of the other borrowers enrolled in SAVE wanted to make payments, none of those payments would count toward PSLF forgiveness, notwithstanding that the involuntary forbearance resulted through no fault of their own.[23]  The ruling involuntarily placed Mr. Ashe and 8 million other student loan borrowers in a financial limbo that continues to this day.[24]

23.    Then, on February 18, 2025, the Eighth Circuit Court of Appeals upheld the district court's temporary ban on SAVE's forgiveness provisions. Acting *sua sponte*, the court unexpectedly called into question the legitimacy of similar provisions under other IDR plans, such as PAYE, REPAYE, and ICR.[25]  Although the court only questioned the legitimacy of the forgiveness provisions

---

[21] *See Missouri v. Biden*, 738 F. Supp. 3d 1113 (E.D. Mo. 2024), *aff'd and remanded sub nom. Missouri v. Trump*, 128 F.4th 979 (8th Cir. 2025).

[22] *The Assault on the SAVE Plan Has Brought Student Debt Relief to a Crossroads*, Peter Granville, *et al.*, THE CENTURY FOUNDATION, Jan. 14, 2025, https://tcf.org/content/commentary/the-assault-on-the-save-plan-has-brought-student-debt-relief-to-a-crossroads.

[23] *Student Loan Pause For 8 Million Could Last A Year, Suggests Court Schedule, With Loan Forgiveness In Limbo*, Adam S. Minsky, FORBES, Sep. 9, 2024, https://www.forbes.com/sites/adammninsky/2024/09/09/student-loan-pause-for-8-million-could-last-a-year-suggests-court-schedule-with-loan-forgiveness-in-limbo/.

[24] *8 million student loan borrowers remain stuck in SAVE. What comes next?*, Andrew Pentis, BANKRATE, June 19, 2025, https://www.bankrate.com/loans/stuck-in-save-what-comes-next/.

[25] *See Missouri v. Trump*, 128 F.4th 979, 998–99 (8th Cir. 2025).

under IDR and said nothing about the legitimacy of those plans' repayment formulas, its decision caused loan servicers to stop processing IDR applications altogether. This created an enormous backlog of applications that left Mr. Ashe and millions of other borrowers unable switch to another IDR plan to continue making qualifying PSLF payments.[26]

24.    Still, in spite of the clear harm caused by foreclosing student loan borrowers enrolled in PSLF from working toward their loau forgiveness, the Eighth Circuit held that the harm was minimized by the fact that the affected student loan borrowers were placed in interest-free forbearance.[27]

### III.    MAGA's targeted assault on existing student loan borrowers and public servants.

25.    In the leadup to the 2024 Presidential Election and during Donald Trump's second presidential term, President Trump and MAGA Republican leaders have been more than transparent about their targeted animus toward innocent student loan borrowers and dedicated public servants. For years, they propagated misinformation that demonized public servants and inaccurately cast student loan borrowers as entitled, reckless spenders.

26.    In particular, *Project 2025*, which is a collection of policy plans developed by conservative think tank The Heritage Foundation and the cornerstone of the MAGA and far-right agenda, "calls for further cuts to student loan forgiveness programs, including the elimination of several affordable repayment plans for borrowers." [28]

27.    Vice President J.D. Vance, a Yale Graduate himself, has openly called student loan relief "a massive windfall to the rich, to the college educated, and . . . [Ivy League] students" [29]

---

[26] *Student Loan Borrowers Blocked From Affordable Repayment Plans*, Tara Siegel Bernard, THE NEW YORK TIMES, Mar. 3, 2025, https://www.nytimes.com/2025/02/28/business/student-loan-repayment-plans.html.
[27] *Missouri v. Trump*, 128 F.4th at 997.
[28] *Trump VP pick Vance once called on GOP to fight student loan forgiveness 'with every ounce of our energy'*, Annie Nova, July 16, 2024, CNBC, https://www.cnbc.com/2024/07/16/trump-vp-vance-on-student-loan-forgiveness.html
[29] *Id.*

28.     MAGA Republican and Senator Ted Cruz has intentionally mislabeled existing student loan borrowers as lazy and unworthy of relief, casting them as "slacker barista[s] who wasted seven years ... studying completely useless things." [30]

29.     Congresswoman Virginia Foxx, a top MAGA Republican on the House Committee on Education and Labor, erroneously claimed that student loan relief forced hardworking Americans "to foot[ ] the student loan bill for graduate students and Ivy League lawyers . . . ."[31]

30.     President Trump has also frequently and publicly referred to government workers "crooked" and "dishonest," and claimed, without any support, that public servants are "destroying this country."[32]

31.     Russell Vought, the Director of the United States Office of Management and Budget and previously President Trump's campaign budget manager told ProPublica, "[w]e want the bureaucrats to be traumatically affected. When they wake up in the morning, we want them to not want to go to work because they are increasingly viewed as the villains." [33]

32.     MAGA Republican and Congresswoman Majorie Taylor Greene, during a House Oversight and Government Reform Committee, even went as far as to broadly declare that public servants "do not deserve their jobs . . . [and] do not deserve their paychecks." [34]

---

[30] *The White House pushes back on Ted Cruz's 'galling' comments that Biden canceled student debt for the 'slacker barista' who studied 'completely useless things' in college*, Ayelet Sheffrey, Aug. 29, 2022, BUSINESS INSIDER, https://www.businessinsider.com/white-house-counters-ted-cruz-student-loan-forgiveness-slacker-barista-2022-8
[31] *Republicans Call Student Loan Relief 'Outrageous' And An 'Insult'*, Zach Friedman, April 7, 2022, FORBES, https://www.forbes.com/sites/zackfriedman/2022/04/07/republicans-call-student-loan-relief-outrageous-and-an-insult.
[32] *Trump calls federal workforce 'crooked,' vows to hold them 'accountable'*, Erich Wagner, GOVERNMENT EXECUTIVE, Aug. 28, 2024, https://www.govexec.com/workforce/2024/08/trump-calls-federal-workforce-crooked-vows-hold-them-accountable/399138; *5 facts about the federal workforce that may surprise you*, Hannah Grabenstein, PBS, NEWS, Feb. 27, 2025, https://www.pbs.org/newshour/politics/trump-has-moved-to-slash-the-federal-government-heres-what-the-data-shows-about-its-workforce.
[33] *White House officials wanted to put federal workers 'in trauma.' It's working*, William Wan and Hannah Natanson, THE WASHINGTON POST, Mar. 20, 2025, https://www.washingtonpost.com/investigations/2025/05/20/federal-workers-trump-mental-health
[34] *Marjorie Taylor Greene: Federal workers 'don't deserve' their paychecks*, Ashley Fields, Feb. 26, 2025, THE HILL, https://thehill.com/homenews/house/5165176-marjorie-taylor-greene-criticized/

33.     Additionally, as second in command, Vice President Vance has publicly called on President Trump "fire every single mid-level bureaucrat, every civil servant in the administrative state. Replace them with our people." [35] He even encouraged President Trump to openly defy court orders, stating "[a]nd when the courts—because you will get taken to court—and when the courts stop you, stand before the country like Andrew Jackson did and say, 'The chief justice has made his ruling. Now let him enforce it.'" [36]

34.     More recently, the Trump Administration issued executive orders seeking to harm or intimidate public servants by weaponizing the PSLF program and restricting loan forgiveness eligibility only to public servants and organizations it believes align with its MAGA Republican ideals and agenda. [37]

### IV.     Trump 2.0 and the One Big Beautiful Bill

35.     On November 6, 2024, Donald Trump won the 2024 Presidential Election and became the 47th President of the United States. [38] In addition, the Republican Party won both the Senate and the House to assume full control of Congress. [39]

36.     From his first day back in office, President Trump, along with his MAGA Republicans, subjected the citizens of this country to a chaotic and acrimonious campaign of

---

[35] *JD Vance's 'Constitutional Crisis' in the Making*, Ankush Khadori, Aug. 12, 2024, POLITICO, https://www.politico.com/news/magazine/2024/08/12/what-jd-vance-gets-wrong-about-the-supreme-court-00173445.
[36] *Id.*
[37] *Trump May Weaponize Student Loans Against Public Servants*, Chas Danner, July 9, 2025, NEW YORK MAGAZINE, https://nymag.com/intelligencer/article/trump-may-weaponize-public-service-student-loan-forgiveness.html ("The Trump Administration continues to make life for student loan borrowers more difficult and their options for relief more limited, and soon. PSLF maybe be used to punish or cajole as much as it is to reward.").
[38] *Donald Trump returns to the White House*, Natalie Allison and Myah Ward, Nov. 6, 2024, POLITICO, https://www.politico.com/news/2024/11/06/donald-trump-wins-presidency-00187478.
[39] *Republicans retain their hold of the House, clinching full control of Congress*, Deirdre Walsh and Susan Davis, Dec. 4, 2024, NPR, https://www.npr.org/2024/11/13/g-s1-33714/republican-election-house-of-representatives.

retribution, with student loan borrowers and public servants absorbing much of President Trump and MAGA Republicans' misdirected rancor.

37.    Within weeks, Russell Vought, the Acting Director of the Consumer Financial Protection Bureau under President Trump and "key architect" behind MAGA's "Project 2025," fired Julia Barnard as the Student Loan Ombudsman and industry watchdog against predatory lending and financial fraud.[40] Barnard's termination cleared the path for the Trump Administration to decimate staffing levels at federal agencies, like ED and the Office of Financial Student Aid, without any fear of regulatory oversight. These mass layoffs plunged the student loan industry into further panic and chaos, sticking a skeleton crew of federal workers with the virtually insurmountable task of resolving an already enormous processing backlog. These efforts are all part of President Trump and MAGA Republicans' far-right agenda to abolish ED and force student loan borrowers to shoulder the costs of tax cuts for the wealthy by eliminating student loan relief options and increasing their monthly payments and overall financial burden.[41]

38.    In response to a federal register published by ED in May of 2025, a coalition of "advocates for students, student loan borrowers, consumer protection, civil rights, union members, veterans, and other stakeholders in higher education" contacted then-Acting Secretary of Education James Bergeron to raise concerns about the Trump Administration's use of procedurally infirm processes to alter the existing repayment plans without providing members of the public an opportunity to be heard.[42] Notably, the coalition stated that it had deep concerns that President Trump and MAGA Republicans were skirting clear procedural and legislative rules "to make

---

[40] *Trump, Vought, and Musk Team Up to Abandon Students and Borrowers, Illegally Fire Top Student Loan Industry Watchdog*, STUDENT BORROWER PROTECTION CENTER, Feb. 14, 2025, https://protectborrowers.org/trump-vought-and-musk-team-up-to-abandon-students-and-borrowers-illegally-fire-top-student-loan-industry-watchdog/#:~:text=February%2014%2C%202025%20%7C%20WASHINGTON%2C.

[41] *See* Mar. 7, 2025 Ltr. from Sen. B. Sanders, *et al.*, to Sec. L. McMahon (attached as Ex. A); *see also* Mar. 17, 2025 Ltr. from Sen. B. Sanders, *et al.*, to Sec. L. McMahon (attached as Ex. B).

[42] *See* June 2, 2025 Coalition Ltr. to Acting Sec. J. Bergeron (attached as Ex. C)

harmful changes to [IDR and PSLF]—both of which act as critical components of the student loan safety net and provide critical debt relief to workers in public sector jobs." [43]

39.    As it turns out, the coalition's concerns were valid, but the Trump Administration and his MAGA Republicans ultimately *did not* utilize the traditional rule-making process as expected. Unsurprisingly, when they opened up the public register for comment, over seven thousand borrowers responded and, upon information and belief, nearly all were in favor of keeping or improving IDR and PSLF.[44] But the docket was nothing but a distraction, because the Trump Administration and MAGA Republicans had a far more sinister trick up their sleeves. After realizing that they were going to be met with strong resistance to wiping out affordable IDR plans through the rule-making process, President Trump and a MAGA Republican-led Congress instead chose to bury devastating student loan policy changes deep within an enormous reconciliation bill to flout procedural safeguards and completely silence public input. This deprived Mr. Ashe and millions of other existing student loan borrowers of meaningful notice and opportunity to be heard, and the Trump Administration denied Mr. Ashe and millions of other student loan borrowers remotely adequate representation.

40.    On May 22, 2025, as part of the 2025 Congressional Budget Reconciliation, a MAGA Republican-led House of Representatives passed the OBBBA and sent it to the Senate for approval with provisions that make steep cuts to healthcare, food, and education programs while adding trillions of dollars to the national debt.[45] Notably, for the purposes of this lawsuit, the OBBBA explicitly eliminates all IDR plans both for new *and existing* student loan borrowers.

---

[43] *Id.*

[44] *Intent to Receive Public Feedback for the Development of Proposed Regulations and Establish Negotiated Rulemaking Committee*, Docket No. ED-2025-OPE-0016-0001, DEPARTMENT OF EDUCATION, Apr. 3, 2025, https://www.regulations.gov/document/ED-2025-OPE-0016-0001

[45] *House passes Trump's sweeping tax-cut bill and sends it to Senate*, Chris Stein, THE GUARDIAN, May 22, 2025, https://www.theguardian.com/us-news/2025/may/22/house-vote-trump-tax-bill

41.    More specifically, Section 82001 of the OBBBA forces all existing student loan borrowers currently enrolled in IDR plans to either switch to a standard repayment plan, a grandfathered version of IBR—which, for many, including Mr. Ashe, would result in 50% increase to his monthly student loan payment—or to enroll in far less generous and hastily contrived income tethered repayment plan called the "Repayment Assistance Plan" (or "RAP").[46] Unlike all the other IDR plans, however, RAP does not take a student loan borrower's discretionary income into consideration when calculating that borrower's monthly payment amount.  Instead, RAP offers a repayment structure that "scales upwards to 10% of [a borrower's] adjusted gross income ("AGI") for the prior tax year, divided by 12."[47]  The percentage multiplied against a borrower's AGI is based on that borrower's income, which is broken down as follows:

- Borrowers who make **less than $10,000** will pay **$120 a year, or $10 a month**.
- Borrowers with an income of **$10,000 to $19,999** will pay **1% of AGI** over twelve months.
- Borrowers with an income of **$20,000 to $29,999** will pay **2% of AGI** over twelve months.
- Borrowers with an income of **$30,000 to $39,999** will pay **3% of AGI** over twelve months.
- Borrowers with an income of **$40,000 to $49,999** will pay **4% of AGI** over twelve months.
- Borrowers with an income of **$50,000 to $59,999** will pay **5% of AGI** over twelve months.
- Borrowers with an income of **$60,000 to $69,999** will pay **6% of AGI** over twelve months.
- Borrowers with an income of **$70,000 to $79,999** will pay **7% of AGI** over twelve months.
- Borrowers with an income of **$80,000 to $89,999** will pay **8% of AGI** over twelve months.
- Borrowers with an income of **$90,000 to $99,999** will pay **9% of AGI** over twelve months.
- Borrowers with an income of **$100,000 or more** will pay **10% of AGI** over twelve months.[48]

And, adding insult to injury, MAGA Republicans also were sure to include a meager $50 "discount" for every child or dependent claimed on that borrower's taxes.[49]

42.    To be clear, RAP is not a meaningful alternative compared to prior IDR plans.  RAP removes all consideration of income protection (*i.e.*, it fails to calculate monthly payments based

---

[46] *See* ONE BIG BEAUTIFUL BILL ACT. PL 119-21. July 4, 2025, 139 Stat 72.
[47] *Repayment Assistance Plan (RAP) Explained: Forgiveness, Payments & More*, Travis Hornsby, STUDENT LOAN PLANNER. July 19, 2025. https://www.studentloanplanner.com/repayment-assistance-plan-rap/.
[48] *Id.*
[49] *Id.*

on discretionary income as opposed to their AGI). Furthermore, for many student loan borrowers—Mr. Ashe included—RAP will lead to an arbitrary and capricious increase in payments by hundreds of dollars per month.[50]

43.    Indeed, under nearly every scenario, the OBBBA increases monthly payments for millions of student loan borrowers, including Mr. Ashe.



| Annual income | RAP | SAVE | Post-2014 IBR | PAYE |
|---|---|---|---|---|
| $10K | $10 | $0 | $0 | $0 |
| $20K | $17 | $0 | $0 | $0 |
| $30K | $50 | $0 | $54 | $54 |
| $40K | $100 | $20 | $138 | $138 |
| $50K | $167 | $62 | $221 | $221 |
| $60K | $250 | $103 | $304 | $304 |
| $70K | $350 | $145 | $388 | $388 |
| $80K | $467 | $187 | $471 | $471 |
| $90K | $600 | $228 | $554 | $554 |
| $100K | $750 | $270 | $638 | $638 |
| $110K | $917 | $312 | $721 | $721 |

Note: Estimate for a single borrower with no children

Source: **Student Borrower Protection Center** analysis of U.S. Senate student loan repayment changes as of June 11, 2025



---

[50] *How House Republicans' Student Loan Repayment Plan Would Disproportionately Harm Low-Income Borrowers*, Michele Zampini, *et al.*, THE INSTITUTE FOR COLLEGE ACCESS AND SUCCESS, May 27, 2025, https://ticas.org/affordability-2/rap-income-protection-reconciliation-2025/.

44.    Once the House sent the OBBBA to the Senate for consideration, Parliamentarian Elizabeth MacDonough ruled that eliminating IDR for existing loan borrowers violated the Byrd Rule, meaning that the provision required a 60-vote supermajority to pass.[51]    The Byrd Rule prevents the inclusion of provisions that do not primarily impact government spending or revenues and are extraneous or regulatory in nature.[52]    Thus, in the context of student loans, the Parliamentarian held that "changing existing repayment plan rules likely exceeded the scope of budget reconciliation" because it "altered existing legal rights and applied to current borrowers in a way that was not tied to the budget."[53]

45.    Still, in spite of Parliamentarian MacDonough unambiguously holding that eliminating IDR plans for existing student loan borrowers clearly exceeded the permissible authority of a budget reconciliation, the MAGA Republican-led Senate ignored the rules and proceeded with the OBBBA anyway.    This time, though, the MAGA Republican-led Senate ostensibly believed that delaying the date upon which existing borrowers would be ousted from their IDR plans would obviate the violation.    This couldn't be further from the truth.    Giving borrowers additional time does not negate the government's blatant malfeasance, it merely delays causing millions of existing student loan borrowers—including Mr. Ashe—inevitable harm.

46.    On July 1, 2025, after some performative grandstanding by "dissenting" Republicans, and with a tie-breaking vote from Vice President Vance, the Senate passed the

---

[51] *Republicans' "One Big, Beautiful Bill" Includes Additional Provisions That Violate the Byrd Rule,* UNITED STATES SENATE COMMITTEE ON THE BUDGET, June 6, 2025, https://www.budget.senate.gov/ranking-member/newsroom/press/republicans-one-big-beautiful-bill-includes-additional-provisions-that-violate-the-byrd-rule.

[52] *Byrd Rule Halts Student Loan Overhaul For Existing Borrowers,* Robert Farrington, FORBES, June 26, 2025, https://www.forbes.com/sites/robertfarrington/2025/06/26/byrd-rule-halts-student-loan-overhaul-for-existing-borrowers/; *see also* 2 U.S.C § 644.

[53] *Id.*

OBBBA and sent it back to the House to ratify the proposed changes.[54] The House subsequently passed the Senate version of the OBBBA and sent it to President Trump's desk for his signature.[55]

47.    On July 4, 2025. President Trump signed the OBBBA into law.[56] What was once a day associated with liberty. for many borrowers, devolved into a grim reminder of their loss of financial freedom. In reality, the OBBBA offsets large tax breaks for the nation's wealthiest 1% and shifts the burden of covering those cuts to student loan borrowers through increased monthly payments, longer forgiveness periods, and much more draconian forbearance rules.

48.    This is the first time in history that a piece of legislation relating to federal student loans repayment plans *increases* the burden for student loan borrowers as opposed to providing additional relief.

### V.    *Secretary McMahon and ED strongarm SAVE borrowers.*

49.    To make matters worse, on July 9, 2025, just days after passing the OBBBA—and with a purported "grace period" for existing borrowers to change plans—Secretary McMahon announced that ED would start collecting interest on all borrowers stuck in SAVE forbearance, beginning August 1, 2025.[57] Secretary McMahon claims that ED's decision to resume interest is based on the need to comply with the Eighth Circuit's injunction and that the OBBBA stripped Secretary McMahon of any authority to offer interest free forbearance.[58] This is false.

---

[54] *Vance breaks 50-50 tie as Senate passes GOP megabill*, Alexander Bolton, THE HILL, July 1, 2025, https://thehill.com/homenews/senate/5379224-senate-passes-trump-gop-megabill/.

[55] *House passes Big Beautiful Bill Act, sending it to Trump after bruising struggle*, Ryan King, *et al.*, NEW YORK POST, July 3, 2025, https://nypost.com/2025/07/03/us-news/house-passes-big-beautiful-bill-act-sending-it-to-trump-after-bruising-struggle/.

[56] *Trump's 'Big Bill' to cost students, universities billions*, Nathan Greenfield, UNIVERSITY WORLD NEWS, July 13, 2025, https://www.universityworldnews.com/post.php?story=20250712105047933.

[57] *U.S. Department of Education Continues to Improve Federal Student Loan Repayment Options, Addresses Illegal Biden Administration Actions,*" press release, UNITED STATES DEPARTMENT OF EDUCATION, July 9, 2025, https://www.ed.gov/about/news/press-release/us-department-of-education-continues-improve-federal-student-loan-repayment-options-addresses-illegal-biden-administration-actions.

[58] *8 Million Federal Student Loan Borrowers Will Soon See Interest Restart,* Tara Siegel Bernard, THE NEW YORK TIMES, July 9, 2025, https://www.nytimes.com/2025/07/09/your-money/student-loans-save-plan-interest.html

50.    "No court has ordered ED to resume interest charges, and . . . courts have cited the interest-free forbearance as justification for continuing to temporarily suspend SAVE while litigation is ongoing." [59] Moreover, "the Administration has the legal authority to suspend interest payments for borrowers in the SAVE forbearance independent of its authorities under the SAVE plan[.]" pursuant to the Higher Education Act.[60]

51.    Secretary McMahon's announcement also comes as a complete policy reversal by President Trump, who once publicly stated that student loans "[are] probably one of the only things the government shouldn't make money off—I think it's terrible . . . ."[61]

52.    Nevertheless, Secretary McMahon and the Trump Administration are now threatening student loan borrowers stuck in SAVE forbearance with interest accrual as part of an effort to intimidate those borrowers into making hasty financial decisions that are not in their best interest. Mr. Ashe is one of those borrowers currently stuck in administrative forbearance.

53.    Not only does the decision to suddenly and unfairly charge interest entirely detract from the Trump Administration's farcical "grace period" for existing borrowers under the OBBBA, but it also ignores "the backlog of 1.5 million unprocessed IDR applications and the glacial pace at which new applications are being approved . . . ." [62]

---

[59] *See* July 17, 2025 Ltr. from Sen. E. Warren to Sec. L. McMahon (attached as Ex. D); *see also Missouri v. Biden*, 112 F.4th 531, 538 (8th Cir. 2024) ("Among the considerations here are that all borrowers currently impacted by our administrative stay are in administrative forbearance and thus not required to pay principal or interest on their loans. . . .").

[60] *See* Ex. D (citing 20 U.S.C. 1082(a)(4), 20 U.S.C. 1087a(b)(2), and *HEA Authority and Extending the Repayment Pause*, UNIVERSITY OF CALIFORNIA STUDENT LOAN INITIATIVE, May 3, 2023, https://www.slli.org/memo-hea-authority-and-extending-the- payment-pause).

[61] *Trump: Why is federal government making money on student loans?*, Kevin Cerilli, July 23, 2015, The Hill, https://thehill.com/policy/finance/248913-trump-why-is-federal-government-making-money-on-student-loans/.

[62] *Id.*

54.    Mr. Ashe, like millions of other borrowers stuck in SAVE forbearance, "[has] no alternative . . . [and is] unable to enroll in an alternative IDR plan and make progress towards debt relief via PSLF or IDR."[63]  Yet, he and millions of other borrowers are being punished for it.

55.    Even more egregious, ED does not expect the supposedly streamlined RAP plan to even become available until at least July of 2026.  Instead, ED is encouraging SAVE enrollees to consider switching to IBR, which, for Mr. Ashe and many other borrowers, would result in at least a 50% increase in their monthly payments.[64]  Although ED claims that borrowers still enrolled in IDR plans like PAYE and ICR can remain on those plans until they are phased out, they are entirely unclear about whether payments made while enrolled in those plans would still count toward PSLF relief.  Consequently, Mr. Ashe and millions of other borrowers could potentially make payments without making any of the PSLF progress they were originally promised and ordinarily would be making prior to the OBBBA.  ED has yet to clarify this point and is remaining intentionally ambiguous in an effort to push borrowers into plans with higher monthly payments.

## VI.    *Mr. Ashe's student loans and ensuing harm*

56.    Mr. Ashe was born and raised in Baltimore, Maryland.  He is the son of two hard-working parents, who at various points in their lives each held two jobs to give Mr. Ashe and his sister the best educations they could afford.  And ever since he can remember, Mr. Ashe always dreamt of becoming lawyer.  Mr. Ashe even declared in his eighth-grade graduation video that he aspired to one day be a practicing attorney.

57.    When Mr. Ashe graduated from college with an international business degree in 2011, he painstakingly scrutinized whether he could afford to attend law school.  At that time, the

---

[63] *Id.*
[64] *8 Million Federal Student Loan Borrowers Will Soon See Interest Restart*, Tara Siegel Bernard, THE NEW YORK TIMES, July 9, 2025, https://www.nytimes.com/2025/07/09/your-money/student-loans-save-plan-interest.html.

economy was just recovering from the 2008 Financial Crisis, and the market for newly minted attorneys was on unsteady footing. As a result, Mr. Ashe decided to wait a few years and obtain some experience in business development and sales until he was able to identify a viable path to law school. And, while the business field offered him some gratification, Mr. Ashe always found himself returning to the idea of obtaining his law degree, all the while keeping a close eye on the various financing options as they became available.

58.     By 2015, Mr. Ashe knew that if he didn't make the jump into law soon, he might miss his calling altogether. He studied and sat for the LSAT, researched schools and tuition costs, and learned about the federal lending and repayment plans available. In 2016, Mr. Ashe was accepted into law school, but his scholarship was not enough to cover the full cost of attendance. Mr. Ashe knew that the only way he would be able to truly afford his dream of becoming a lawyer, would be to take out federal student loans, enroll in an affordable IDR plan, like REPAYE or PAYE, and to work in public service for ten years to qualify for PSLF forgiveness.

59.     Mr. Ashe's decision to finally pursue his law degree and to take out federal student loans was based on the express promises and representations by the government that PAYE and REPAYE plans were long-term and affordable repayment plans eligible for PSLF relief.

60.     Mr. Ashe enrolled in law school with the express understanding, based on ED's published materials and his MPNs, that he would be eligible for IDR plans, such as PAYE and REPAYE, and for PSLF if he remained in qualifying public service.

61.     Mr. Ashe read about these programs on ED's website; he learned about them through ED's mandatory entrance counseling; and he attended pre-enrollment orientations that explicitly discussed long-term financial planning and managing student loan debt based on materials published and advertised by ED.

20

62.    Moreover, Mr. Ashe's MPNs expressly incorporated REPAYE, PAYE, and PSLF as available repayment plans, dedicating entire sections to the programs.

63.    Thus, Mr. Ashe reasonably relied on the existence and continuation of REPAYE, PAYE, and other IDR plans as integral to his decision to pursue his law degree and build a career in public service.

64.    By 2019, Mr. Ashe's dream came true. Mr. Ashe graduated from law school magna cum laude as a first-generation attorney and in the top 15% of his class; he passed the Uniform Bar Exam in one try—and with a score high enough to waive into any of the administering member states; he landed a judicial clerkship and subsequently began a fulfilling career in public service where he helped save his community upwards of $300 million in adverse judgments; he also met his wife and made amazing friends as a result of his decision to pursue his law degree.

65.    Mr. Ashe has not taken out any more student loans since graduating law school in 2019. And, as soon as his grace period ended after law school, Mr. Ashe enrolled in REPAYE and PSLF. He has never missed a required payment and diligently recertifies his income every year. Mr. Ashe has been paying on an IDR plan for approximately five years and is halfway through his PSLF enrollment.

66.    In 2023, however, President Biden created the SAVE plan, which automatically migrated Mr. Ashe from REPAYE into SAVE. For a few months, Mr. Ashe was able to make payments and earn credit toward his PSLF while enrolled in SAVE. But due to the Eight Circuit's injunction that resulted from the MAGA Republican-led legal challenges to the forgiveness provisions of SAVE, Mr. Ashe has been involuntarily stuck in administrative forbearance for over a year. The forbearance has prohibited him from making any monthly payments, and it has unreasonably delayed Mr. Ashe's ability to continue his progress toward PSLF relief.

21

67.    Mr. Ashe has contacted his loan servicer multiple times to no avail, and he submitted an application to switch IDR plans to PAYE in December of 2024.

68.    Mr. Ashe has also contacted his loan servicer for updates, but he is continuously provided no specific information other than that his ED is facing massive application backlogs.

69.    The sweeping political efforts by President Trump and MAGA Republicans to dismantle income-driven repayment plans entirely, amid the involuntary administrative forbearance, has caused Mr. Ashe to suffer undue financial and emotional harm.

70.    To this day, Mr. Ashe's PAYE application remains unprocessed and incomplete. Yet, due to the arbitrary and capricious decision by ED and Secretary McMahon, Mr. Ashe will be charged interest while he remains trapped in administrative forbearance. This interest accrual punishes Mr. Ashe and other student loan borrowers for litigation initiated by the very politicians who imposed the harmful policy in the first place, creating a feedback loop of political retaliation.

71.    Mr. Ashe never contemplated that his government would later renege on its promises and strip him of his vested property rights pursuant to his long-term financial contracts. And his MPNs contain no terms that would contemplate forcing him to enroll in a program with substantially higher monthly payments.

72.    Without PAYE or REPAYE under IDR, Mr. Ashe has no other choice but to enroll in RAP. IBR will result in a 50% increase in Mr. Ashe's monthly payment; and Mr. Ashe cannot afford his monthly payment on the standard repayment plan. RAP unfairly and illegally forces Mr. Ashe to pay higher monthly payments and submit to *post hoc* contractual terms to which he did not assent or agree.

73.    Kicking Mr. Ashe off his IDR plan and forcing him to enroll in RAP substantially increases Mr. Ashe's overall financial burden because it will increase Mr. Ashe's payment by

22

approximately $200 per month—at least. Additionally, due to RAP's unforgiving payment calculation, any potential raise or wage increase that Mr. Ashe might enjoy in the future will be drastically offset by the corresponding jump in his monthly payments.

74.    Mr. Ashe has made long-term life, career, and financial decisions based on the government's express representations and promises of IDR.

75.    Mr. Ashe wants to pay his loans, and he wants to make his payments, but Mr. Ashe wants to do so according to the terms to which he and the government originally agreed.

76.    Mr. Ashe has suffered and will continue to suffer increased financial burdens, mental distress, and loss of progress toward PSLF due to Defendants' malicious and wanton actions.

### COUNT I
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT

77.    Mr. Ashe incorporates by reference all allegations in the preceding paragraphs.

78.    The APA provides a cause of action in federal district court for any person aggrieved by final agency action.[65] Particularly, under the APA, any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . is entitled to judicial review thereof."[66]

79.    The APA requires courts to compel agency actions that are unlawfully withheld or unreasonably delayed.[67]

80.    The APA also requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; . . .

---

[65] *See* 5 U.S.C. §§ 702-704.

[66] 5 U.S.C. § 702.

[67] 5 U.S.C § 706 (West).

without observance of procedure required by law; . . .or . . . unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." [68]

81.    In this case, Secretary McMahon and ED have violated the APA by failing to take any meaningful action to ensure that IDR applications and recertifications are expeditiously processed.

82.    This backlog harms Mr. Ashe and millions of other existing student loan borrowers who are attempting to switch to another IDR Plan so that they may continue making payments because it will inevitably cause Mr. Ashe's and those borrowers' principal balances to unnecessarily increase.[69]

83.    Additionally, Secretary McMahon and ED have failed to provide any clarity over whether existing student loan borrowers who remain enrolled in current IDR plans, such as PAYE, will continue to receive credit towards PSLF forgiveness.

84.    Yet, Secretary McMahon and ED have arbitrarily and capriciously decided to charge Mr. Ashe and millions of other SAVE borrowers stuck in involuntary administrative forbearance with interest and have provided false and unsupported reasoning in support of this illegal action.

85.    This decision causes direct and substantial harm to Mr. Ashe by forcing him to involuntarily accrue interest on his principal balance without any meaningful opportunity to switch repayment plans or make progress toward PSLF relief.

---

[68] *Id.*
[69] *See* Ex. D.

86.     Mr. Ashe, along with the millions of other SAVE borrowers, will be charged hundreds of dollars in interest each month, which experts estimate will amount to \$27 million in unnecessary costs in the next year, alone.[70]

87.     No court has ordered Secretary McMahon or ED to start charging Mr. Ashe or the millions of other SAVE borrowers stuck in administrative forbearance with interest.

88.     In reality, the Eight Circuit expressly found the interest free forbearance reasonable and especially persuasive in deciding whether to uphold the injunction resulting from the SAVE litigation. Plus, Defendants clearly have the authority to suspend interest during the interim of the SAVE litigation as evidenced by prior suspensions and express provisions in law.[71]

89.     Secretary McMahon and ED's actions violate constitutional rights of Mr. Ashe and the millions of other SAVE borrowers stuck in involuntary administrative forbearance.

90.     Secretary McMahon and ED have taken no meaningful steps to open the decision to charge Mr. Ashe or the millions of other SAVE borrowers stuck in involuntary forbearance with interest to public comment or to subject it to the formal rule-making process.

91.     Furthermore, all Defendants have arbitrarily and capriciously acted to deprive Mr. Ashe and millions of other existing student loan borrowers of their constitutional rights by repealing IDR plans that were expressly relied upon when agreeing to take out long-term student loan debt and imposing stricter contractual terms with increased monthly payments.

92.     Due to the fact that Defendants are unlawfully charging Mr. Ashe and millions of other SAVE borrowers interest by the day, they inevitably will suffer immediate and irreparable

---

[70] *Id.*

[71] 20 U.S.C. 1082(a)(4), 20 U.S.C. 1087a(b)(2), and *HEA Authority and Extending the Repayment Pause*, UNIVERSITY OF CALIFORNIA STUDENT LOAN INITIATIVE, May 3, 2023, https://www.slli.org/memo-hea-authority-and-extending-the- payment-pause.

25

harm long before the Defendants can be heard in opposition. Therefore, issuing a temporary restraining order without written or oral notice is appropriate in this case.

## COUNT II
## BREACH OF CONTRACT

93.    Mr. Ashe incorporates by reference all allegations in the preceding paragraph.

94.    Mr. Ashe and Defendants entered into a valid contract which is memorialized through Mr. Ashe's MPNs.

95.    The terms of Mr. Ashe's MPNs explicitly state that IDR, including PAYE and REPAYE would be available repayment plans upon Mr. Ashe assenting to incur significant, long-term student loan debt.

96.    None of the terms within the Mr. Ashe's MPNs contemplate repealing IDR or imposing stricter repayment terms with higher monthly payments.

97.    Had such terms been expressly included within Mr. Ashe's MPNs, Mr. Ashe would never have agreed to such an inequitable imbalance of power.

98.    Mr. Ashe never contemplated or assented to the notion that Defendants could one day renege on their express and long-term promises to provide affordable IDR plans, like PAYE and REPAYE, in order to work toward PSLF relief.

99.    By enacting legislation that explicitly repeals all IDR plans for existing borrowers Defendants have violated the express terms set forth in Mr. Ashe's MPN and, therefore, have committed a breach of contract.

100.    Upon information and belief, the same is true for the millions of other existing student loan borrowers who enrolled IDR prior to the enactment of the OBBBA.

## COUNT III
### DETRIMENTAL RELIANCE

101.    Mr. Ashe incorporates by reference all allegations in the preceding paragraphs.

102.    Defendants made express authorized and affirmative representations and promises of affordable IDR plans to Mr. Ashe through ED's website, mandatory entrance counseling, publications and advertisements. Those IDR plans were expressly incorporated terms in Mr. Ashe's MPNs, which form the bases of legally binding contracts.

103.    Mr. Ashe reasonably relied on the continued availability of IDR plans as a deciding factor to attend law school and to take on significant and long-term student loan debt. The reasonableness of Mr. Ashe's decision and reliance is further evidenced by the tens of millions of other borrowers also similarly relied on Defendants' express promises to make similar higher education decisions.

104.    Defendants knew or should have reasonably known or expected that promising these repayment terms and affordable IDR plans would induce Mr. Ashe and millions of other then-prospective student loan borrowers to agree to the long-term decision to take out loans as an investment in their educations.

105.    Mr. Ashe in fact did rely on Defendants' express promises and representations as the deciding factor to take out student loan debt to cover the remaining cost of law school. Upon information and belief, millions of other student loan borrowers similarly relied on Defendants express representations upon agreeing to take out student loans.

106.    The availability and longevity of affordable IDR plans and PSLF formed the foundation of Mr. Ashe's expectations and long-term financial-planning.

107.    Like the millions of other similarly situated borrowers. Mr. Ashe made irrevocable life decisions to take out long-term student loans to attend law school based on the good-faith

27

belief and reasonable expectation that Defendants would honor their agreement by continuing to offer IDR as an available repayment option and not renege on their agreement after Mr. Ashe has already performed.

108.    By inducing Mr. Ashe and to take out long-term debt only to materially alter or breach the original terms of their agreement, Defendants have irreparably harmed Mr. Ashe, as well as millions of other similarly situated student loan borrowers.

109.    Defendants must be required to uphold their end of the agreement.

## COUNT IV
### VIOLATION OF THE FIFTH AMENDMENT TAKINGS CLAUSE

110.    Mr. Ashe incorporates by reference all allegations in the preceding paragraphs.

111.    The Fifth Amendment's Takings Clause prevents Defendants from depriving Mr. Ashe of vested property rights except for a "public use" and upon payment of "just compensation."

112.    This constitutional right exists to protect "property" and "liberty" interests created and defined by independent legal sources, not by the Constitution.

113.    A taking occurs if a particular regulation "force[s] 'some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'"

114.    Defendants' decision to repeal all IDR plans for Mr. Ashe and existing student loan borrowers has no legitimate public purpose other than to harm or punish a group that Defendants openly politically disfavor.

115.    As previously stated, the unconstitutional legislation farcically seeks to offset tax cuts for the nation's wealthiest by illegally forcing existing student loan borrowers to pay higher monthly payments, which runs contrary to terms to which those borrowers expressly agreed.

28

116.    Mr. Ashe, along with millions of other student loan borrowers, made long-term financial decisions based on the Defendants' express representations and promises that the terms to which he initially agreed would be available for the remainder of his repayment period.

117.    Since they took out long-term debt, which cannot be undone, Mr. Ashe and those millions of other existing student loan borrowers have a vested interest in their agreed-upon repayment progress and loan terms, because they were express representations and terms incorporated into their MPNs and contracts.

118.    Being forced to switch into the new, less favorable, repayment plan like RAP will have a significant and negative financial impact on Mr. Ashe and the millions of other existing student loan borrowers currently enrolled in IDR.

119.    Mr. Ashe made long term plans and financial arrangements based on the ED's promise that the terms to which he initially agreed would be available for the remainder of his repayment period.

120.    Defendants' governmental action at issue has no legitimate public purpose other than to harm students.

121.    The retroactive destruction of these rights constitutes a taking without just compensation, which is a direct violation of Mr. Ashe's rights and the rights of millions of other student loan borrowers.

## COUNT V
### DUE PROCESS VIOLATIONS

122.    Mr. Ashe incorporates by reference all allegations in the preceding paragraphs.

123.    Due Process means an opportunity to be heard at a meaningful time, in a meaningful manner, and prior to the deprivation of the right or rights at issue.[72]

124.    Substantive due process prohibits "arbitrary, wrongful government action regardless of the fairness of the procedures used to implement them."[73]

125.    In addition, the Due Process Clause protects against retroactive legislation, as the presumption against such legislation is deeply rooted in American jurisprudence.[74]

126.    Here, "Congress enacted the Higher Education Act of 1965 . . . to keep the college door open to all students of ability, *regardless of socioeconomic background.*" [75]

127.    Mr. Ashe has a protected property interest in keeping IDR and its PSLF eligibility as an available repayment option, as do millions of other existing student loan borrowers who acted upon Defendants' express representations regarding the long-term availability of those plans.

128.    Repealing all IDR plans retroactively, without individualized notice or any hearing severely harms Mr. Ashe and violates his procedural due process rights, along with the rights of millions of other student loan borrowers.

129.    Plus, providing existing borrowers until 2028 to change plans does not lessen or eliminate the harm, because the decision to take out student loan debt is a long-term financial investment in one's education, which cannot be undone once the loans are taken out.

---

[72] *Residents Against Flooding v. Reinvestment Zone No. Seventeen, City of Houston, Texas*, 260 F. Supp. 3d 738, 763–64 (S.D. Tex. 2017), *aff'd sub nom. Residents Against Flooding v. Reinvestment Zone No. Seventeen*, 734 Fed. Appx. 916 (5th Cir. 2018).

[73] *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990).

[74] *See, Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).

[75] *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 640 (7th Cir. 2015) (emphasis added) (citations and quotations omitted).

30

130.    Mr. Ashe has suffered and will continue to suffer harm regardless of whether he is forced from his IDR plan today or in three years, because the remainder of his PSLF commitment continues well beyond the transition date. The same can be said for millions of other borrowers.

131.    Defendants exceeded their authority when they bootstrapped regulatory provisions that repeal all IDR plans for existing student loan borrowers through congressional budgetary reconciliation in flagrant violation of the Byrd rule and without a 60-vote super majority.[76]

132.    Such action deprived Mr. Ashe and millions of other existing student loan borrowers of their procedural and substantive due process rights, because Mr. Ashe and those borrowers had a protected property interest in keeping IDR and its PSLF eligibility as an available repayment option, and they received little to no representation, given that there was no meaningful way to oppose Defendants' action without requiring a 60-vote supermajority.

133.    Not to mention, Defendants have engaged in the very type of predatory lending that they have specifically enacted regulations to prevent.[77]

134.    Indeed, if any private lender had engaged in similarly unlawful conduct as Defendants have here—*i.e.*, intentionally exploiting borrowers' reliance interests to materially alter contractual terms with increased monthly payments—those lenders would almost immediately be subject to civil and potentially criminal liability under federal and state laws.

---

[76] *See* 2 U.S.C § 644.

[77] Federal regulations define "unlawful" or "abusive" lending as acts that cause substantial consumer injury that the consumer cannot reasonably avoid and that outweigh countervailing benefits to consumers or competition. *See* 12 U.S.C.A. § 5531. "Abusive" lending is anything that "materially interferes with a consumer's ability to understand a term[s] or condition[s] of a consumer financial product or service . . ." or that takes unreasonable advantage of the consumer's lack of understanding of the risks, costs, or conditions associated with the product or service, the consumer's inability to protect his or her own interests in the product or service, or the consumer's reasonable reliance on a lender or covered person to act in the consumer's interests. *Id.*; *see also* 15 U.S.C. § 1639c (prohibiting private lenders from, inter alia, extending credit without regard to a consumer's ability to pay).

31

135.    It, therefore, defies logic and fairness to exempt Defendants from accountability when Defendants have stepped squarely into the role of a lender only to engage in conduct that would otherwise be deemed unlawful in any private financial lending context.

136.    Mr. Ashe, along with millions of other existing student loan borrowers, has a fundamental right to financial autonomy, to freely select and pursue a career of his choosing, and to be free from government-created dangers. Additionally, Mr. Ashe has a fundamental right to contract with his own government, without Defendants engaging in predatory lending practices and unnecessarily subjecting him to imminent or long-term financial peril.

137.    By engaging in misleading or coercive loan structures, Defendants have knowingly placed Mr. Ashe and millions of other borrowers in a financial jeopardy that Mr. Ashe and those borrowers would not have otherwise faced were it not for Defendants' illegal and unconstitutional conduct. Defendants' actions are so shocking o the conscience that they violate Mr. Ashe's substantive due process rights.

138.    Accordingly, one of the only ways to hold Defendants accountable for their egregious behavior is to find that they have violated Mr. Ashe's procedural and substantive due process rights, along with the rights of millions of other existing student loan borrowers.

## COUNT VI
### VIOLATION OF THE EQUAL PROTECTION CLAUSE (TARGETED ANIMUS)

139.    Mr. Ashe incorporates by reference all allegations in the preceding paragraphs.

140.    "A party may prove that it has been singled out for different treatment in violation of the equal protection clause in the absence of some invidious classification or abuse of a fundamental right by showing, in addition to different treatment, evidence of bad faith or malicious intent to injure."[78]

---

[78] *Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen of Town of Randolph*, 932 F.2d 89, 94 (1st Cir. 1991).

32

141.    As highlighted throughout this Complaint, Defendants have openly and repeatedly made known their ill will and malicious intent toward public servants and student loan borrowers.[79]

142.    Defendants' public statements establish their bare desire to harm student loan borrowers and public servants, who Defendants clearly consider to be a politically unpopular group.[80]

143.    Defendants' decision to repeal all IDR plans for Mr. Ashe and millions of other existing student loan borrowers and public servants is solely derived from Defendants' targeted animus, which does not constitute a legitimate government interest and is rife with punitive intent.[81]

144.    Defendants' conduct specifically targets Mr. Ashe, and citizens like Mr. Ashe, who is merely exercising his constitutional right to pursue a livelihood in public service and higher education. Defendants have discriminated against Mr. Ashe and those similarly situated to him based on his economic status, professional identity, and political association.

145.    Defendants' actions violate Mr. Ashe's rights, and the rights of millions of other student loan borrowers and public servants, under the equal protection clause because Defendants singled them out as politically disfavored groups and subjected them to less favorable treatment that runs contrary to any legitimate government interest.

---

[79] *See, e.g.*, Compl., ¶¶ 24-33.
[80] *See Romer v. Evans*, 517 U.S. 620, 634–35 (1996).
[81] *Id.*

## COUNT VII
### VIOLATION OF THE FIRST AMENDMENT

146.    Mr. Ashe incorporates by reference all allegations in the preceding paragraphs.

147.    The First Amendment protects the right of individuals to freely associate and express themselves, including through how an individual spends money or pursues a chosen profession or community.

148.    By taking out student loans and planning a career in public service, Mr. Ashe intended to convey the particularized message that he views graduate and professional education as an important investment in one's future, and that he values dedicating his profession, skills, and expertise to serve his community.

149.    As a public servant and student loan borrower enrolled in PSLF and IDR, Mr. Ashe exercised his freedom of association by choosing a career in public interest while participating in a congressionally created loan forgiveness pathway.

150.    Defendants' decision to abruptly repeal long-established IDR plans, along with their persistent threats to eliminate PSLF, constitutes retaliation against Mr. Ashe for lawfully exercising his protected freedom of expression and association under the First Amendment.

151.    Defendants have supported budgetary and legislative actions aimed at dismantling student loan forgiveness and relief programs in a manner that punishes Mr. Ashe and the affected class of students and public servants for their career choices and political alignment.

152.    Defendants' unconstitutional targeting of Mr. Ashe for engaging in such protected conduct has harmed Mr. Ashe and disrupted his long-term life and financial plans.

153.    Defendants' unlawful conduct has similarly targeted and harmed other student loan borrowers and public servants for engaging in protected activity.

34

154.    There is no compelling governmental interest that justifies retroactively stripping away repayment options and punishing individuals for exercising their rights to associate and express themselves through their economic choices or career decisions.

155.    Any purported interest that Defendants may claim is undercut by the punitive and politically motivated character of the student loan provisions of the OBBBA and the numerous disparaging statements from President Trump and his MAGA Republican leaders.

### PRAYER FOR RELIEF

WHEREFORE, Mr. Ashe respectfully requests that this Honorable Court:

a.    Issue preliminary and permanent injunctive relief prohibiting ED and Secretary McMahon from illegally charging interest to Mr. Ashe and the millions of other SAVE borrowers stuck in involuntary administrative forbearance;

b.    Compel Defendants to revert Mr. Ashe's principal balance, along with the principal balances for all other SAVE borrowers, back to the original amounts that reflected on their respective federal student loan accounts prior to August 1, 2025;

c.    Declare the provisions of the OBBBA repealing all IDR plans for Mr. Ashe and millions of other existing student loan borrowers unconstitutional and unlawful;

d.    Declare that Defendants are in breach of contract;

e.    Declare that Mr. Ashe, and millions of other student loan borrowers, detrimentally relied on Defendants' authorized and express representations and that Defendants are equitably estopped from terminating all IDR plans for existing borrowers;

f.    Compel Defendants to reinstate all IDR plans, including ICR and PAYE, and to perform their contractual duties by continuing to offer the affordable repayment plans that Mr. Ashe and those existing student loan borrowers were originally promised when their student loan debt was first undertaken;

g.    Compel Defendants to reinstate REPAYE as a repayment plan option for Mr. Ashe and other existing student loan borrowers;

h.    Issue a writ of mandamus compelling resumption of PSLF credit accrual;

i.    Award attorneys' fees and costs; and

j.    Grant any and such further relief as this Court deems just and proper.

Date: August 8, 2025                                    Respectfully Submitted

Kyle A. Ashe
27 Arverne Court
Lutherville-Timonium, MD 21093
410-627-1189
kylea.ashe@gmail.com
*Pro Se Plaintiff*